**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA        :

    v.                       :       CRIMINAL CASE NUMBER:

KINGSTON ANSAH           :       1:17-CR-00381-1-WSD-JSA

**ORDER AND FINAL REPORT AND RECOMMENDATION**

On June 22, 2017, a team of U.S. Postal Inspectors arrived at Defendant Kingston Ansah's residence to execute a search warrant.  Defendant was later indicted for various charges of fraud, identity theft and money laundering relating to the investigation.  After an evidentiary hearing and briefing, the case is before the undersigned on various motions to suppress relating to statements and other evidence obtained during the search.  As explained below, the Court generally rejects the arguments and theories of suppression advanced by the Defendant, with one exception.  Specifically, the Court agrees with the Defendant that the Government has not proven that Defendant's statements to the inspectors revealing his password to his mobile telephone were made voluntarily.

Because of this finding, the Court **RECOMMENDS** that Defendant's Motion to Suppress Statements [24] be **DENIED IN PART and GRANTED IN**

**PART**, and that Defendant's Motion to Suppress Evidence Seized from Electronic

Devices [41], be **GRANTED**.

## FACTUAL BACKGROUND

On June 19, 2017, another U.S. Magistrate Judge on this Court issued

warrants that authorized U.S. Postal Inspectors to search residential and business

premises associated with Defendant Ansah. *See* Gov't Hearing Exs. 2-3. A team

of approximately nine postal inspectors, under the direction of lead agent Jacob

Petronis, executed the residential warrant in the morning of June 22, 2017.

Hearing Transcript [49] ("Tr.") at 8-9. After Defendant opened the door, the

inspectors placed him and another occupant (Bijoux Sampson) in handcuffs, and

restrained them outside of the residence while the inspectors conducted a

protective sweep of the residence. Tr. at 12. According to Sampson, who testified

at the hearing, officers pointed guns directly at him, threatened "hands up or I'll

shoot," forced him and Ansah out of the house while Sampson was wearing just

underwear, and kept them outside in the rain for approximately 15 minutes. *See id*.

at 65-67, 74-77. Inspector Petronis, however, testified that this process only took

three to five minutes. Tr. at 12.[1]

---

[1] The Court does not perceive this difference to be dispositive in the resolution of
any of the legal issues in dispute. If it were necessary to resolve this discrepancy,
the Court finds that the recollection of Petronis, a trained and professional agent

After the house was cleared, the inspectors holstered their weapons, released the cuffs on Defendant and Sampson, and allowed them to sit on a couch in the living room. *See* Tr. at 12-14. Inspector Petronis informed the occupants that the inspectors were present to conduct a search, and he advised them that they were not compelled to stay and could leave if they wanted. Tr. at 12-13.[2] The Defendant remained, and after approximately 20 minutes, Inspector Petronis asked whether he could interview the Defendant. Tr. at 13. The Defendant agreed, and Petronis and another inspector (Bell) took the Defendant to a private room within Defendant's residence. Tr. at 15.

The inspectors did not restrain the Defendant, did not block his route to the door, and did not frisk or touch him in any way during the interview. Tr. at 15-16.

---

whose testimony was generally credible, is likely to be more reliable on a specific detail such as the duration of time, rather than the recollection of a bystander who was no doubt operating under a certain amount of shock at the inception of this encounter.

[2] Later, in the recorded interview, Inspector Petronis again advised the Defendant that he was not under arrest, was free to leave, and was not compelled to talk. Ex. 1 at 4:07-4:40. Inspector Petronis prefaced this statement by saying "like I told you earlier on the couch." *Id.* This preface corroborates Inspector Petronis's testimony at the hearing that he had initially advised Defendant of these matters prior to the interview itself. Tr. at 12-13. Thus, although Defendant draws legal significance to the fact that the recorded advisements were not made until approximately the four-minute mark of the interview, *see* Def. Br. [54] at 6-7 n. 3, 22, the Court finds such argument to be meritless, because these recorded advisements simply repeated what Inspector Petronis had already stated.

A recording of the approximately 45-minute long interview was introduced into the record as Gov't Ex. 1, and portions were played during the evidentiary hearing. The recording shows that the inspectors clearly informed Defendant that he was not under arrest, that he could leave, and that he was not required to answer any questions. Ex. 1 at 4:00-5:20.

The major issue in dispute in the suppression motions is a series of questions posed, tactics employed, and statements made by the inspectors, to get the Defendant to divulge the password to his cell phone. The inspectors informed the Defendant that they would be seizing his cell phone as authorized by the warrant. Defendant responded with audible distress at the prospect of losing his cell phone. *See* Ex. 1, approx. 19:00-20:00. The inspectors told the Defendant that they would be able to return the phone itself back sooner if he would agree to share his password to unlock the phone. *Id*. The inspectors indicated that they needed to be able to make an "image" copy of the phone before they could return it, and that they could do so substantially faster with the password. *Id*. The defendant nevertheless hesitated to share his password, noting that he used this same password for multiple items. In response, Inspector Bell assured the Defendant, that **"we're not going into your e-mails or anything like that."** *Id.*

Approximately 18 minutes later, after some particularly pointed questions about some apparently false identification documents, the Defendant stated that he

wanted to speak with a lawyer before continuing the discussion.  Ex. 1 at approx. 37:25.   The inspectors indicated that Defendant's lawyer should contact the prosecutor to discuss the matter.  *Id.* However, the inspectors continued to add significant commentary after the Defendant had invoked his right to speak with a lawyer, including that they (the inspectors) believed that Defendant was being untruthful with them, that "what you told us today makes no sense."  *Id*. at 37:25-39:40.

At that point, Defendant stated that his attorney's telephone number and others that he needed were in his cell phone's contacts.  *Id.* at approx. 40:00.  Inspector Petronis stated, "[b]efore we leave, we'll get you any phone that you need," but that "without a passcode it's gonna take a while . . . ."  Defendant at that point agreed to share the passcode.  *Id*. at 40:20-40:35.

After Defendant divulged the passcode, the inspectors continued to press Defendant for consent to search the contents of the phone.   The inspectors told the Defendant that if he did not consent, they would get a warrant anyway, and therefore they did not really need his consent.  *Id*. at 40:48-41:55. They informed him, however, that obtaining a warrant would take more time, and that it would speed up the process of returning the phone to Defendant if he would consent to

the search.  *Id*.[3]  The Defendant clearly hesitated in allowing the inspectors to

search the contents of the phone, and stated that he should contact his attorney to

discuss this matter first before considering such a request.  *Id.*  at 41:30-41:41.   In

response, Inspector Bell further advised the Defendant, who had already stated his

desire to speak to a lawyer, "[t]he phone part of it, ***you don't need an attorney***."

*Id*. at 41:41.  After the inspectors reiterated that they did not actually need

consent—because they would get a warrant anyway—and therefore that consent

would only help the Defendant—by speeding up return of his phone—the

Defendant finally agreed to give up his instinct to speak with a lawyer and he

consented to the search of his phone.  *Id*. at 42:10.

    As of the evidentiary hearing—eight months after the search in which the

Defendant had agreed to divulge his passcode based in part on promises that doing

so would speed up return of his phone—the phone has not been returned.  *See* Tr.

at 44, 73.

---

[3] As noted in the discussion below, the Government does not rely on this consent.

## DISCUSSION

I.    **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

    A. *Miranda*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his rights to remain silent and to the assistance of counsel prior to any interrogation by law enforcement.  It is undisputed the inspectors did not furnish *Miranda* warnings to Defendant and that he was nevertheless interrogated.  The question, however, is whether the Defendant was in custody at the time of this interrogation, because otherwise the protections of *Miranda* simply do not apply.  *See United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).

The Supreme Court in *Miranda* explained that custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  *Id.* 384 U.S. at 444.  The Court subsequently defined "custody" in this context as a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).  It is the Defendant's burden to demonstrate that he was in "custody" during questioning and that *Miranda* thereby even applies.  *See United*

*States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977); *see also United States v. Peck*, 17 F.Supp.3d 1345, 1353-55 (N.D.Ga. 2014).

The Supreme Court has provided a non-exhaustive list of factors courts should consider in determining whether a suspect is in "custody" for purposes of Miranda:

> As used in our Miranda case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, considering the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.  And to determine how a suspect would have gauge[d] his freedom of movement, courts must examine all the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Howes v. Fields*, 565 U.S. 499, 508 (2012).

Defendant couches much of his argument as falling under *Miranda*, but the Court does not perceive a *Miranda* violation.  Put simply, the Court does not find that the Defendant has met his burden to establish that he was in custody—and thus that he was entitled to *Miranda* warnings—at any point during the September 22 interview and search.

After a brief detention to facilitate a security sweep of the house, the Defendant was unrestrained and the inspectors holstered their weapons the entire remainder of the time.  Significantly, the inspectors advised the Defendant that he was free to leave, that he was not under arrest, and that he did not have to speak with them at all.  This encounter took place within Defendant's own home, and he was not dragged to a police station or some other unknown location.  The incident was also relatively short: Inspector Petronis indicated that after the initial security sweep, the agents began searching for approximately 20 minutes before he and Inspector Bell requested to interview the Defendant, which interview then lasted approximately 45 minutes.  And Defendant was not, in fact, taken into custody afterwards.  Defendant has pointed to nothing that occurred or was said during this interview to suggest that Defendant was in custody.

Courts in this Circuit have repeatedly declined to find an interview to be custodial in similar circumstances, even after the sort of forced entry and restraints typical of a search.  *See United States v. Matcovich*, 522 Fed.App'x 850, 852 (11th Cir. July 3, 2013) (unpublished) (interview during execution of search warrant in defendant's residence was noncustodial where entry by law enforcement created a "police-dominated atmosphere with a number of officers handcuffing residents and bringing them to a central location," but where, "shortly thereafter, the search warrant was announced, the handcuffs were removed, and the residents were told

that they were not under arrest"); *United States v. Graham*, No. 3:13–cr–11–TCB, 2014 WL 2922388, at *3, *6 (N.D.Ga. June 27, 2014) (Batten, J.) (defendant was not in custody when fifteen agents entered residence with guns drawn while yelling "police, search warrant," handcuffed defendant briefly, escorted him to a basement in the residence for questioning, and during the interview told the defendant that he was not in custody); *United States v. Peck,* 17 F.Supp.3d 1345, 1358-1366 (N.D. Ga. 2014) (Totenberg, J.) (defendant was not in custody when he was questioned by two agents in small bedroom with closed door away from his family for one hour during execution of search warrant).

Indeed, that Defendant "was interviewed in familiar surroundings," weighs against a finding of custodial status.  *See United States v. Brown*, 441 F.3d 1330, 1346–47 (11th Cir. 2006).  And that the officers expressly advised Defendant that he was free to leave has been held to be a "powerful factor" that "generally will lead to the conclusion that the defendant [wa]s not in custody." *Id*.  The Court therefore concludes that Defendant was not "in custody" for purposes of *Miranda*.

### B. Voluntariness

More fundamentally, regardless of whether *Miranda* applies, the Government is still prohibited from introducing or making other use of any statements that were not voluntarily-made by a suspect.  The Government bears the

burden to show that the Defendant's statements were made voluntarily.  *See Jackson v. Denno*, 378 U.S. 368 (1964).  Determining whether a statement is voluntary depends on whether, under all the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

The primary focus of the voluntariness inquiry is whether there has been police overreaching. *United States v. Bernal–Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics." *Id*. Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir.1985) (citation and quotations omitted). Among the non-exclusive

factors to consider are the Defendant's education and intelligence, length of

detention, length of questioning, the use of coercive interrogation techniques and

whether Defendant was advised of his constitutional rights. *Id.*

Although courts have traditionally found statements to be involuntary if

"obtained by any direct or implied promises, however slight," there is no *per se*

rule governing this determination. *See United States v. Lall*, 607 F.3d 1277, 1285

(11th Cir. 2010) (summarizing change in jurisprudence on this point). Instead, the

issue of voluntariness is measured based on the totality of circumstances as

discussed above. *Id.*; *Fulminante*, 499 U.S. at 284-285. Nevertheless, the courts

recognize that an interrogator's promises of leniency, or other assurances or

deceptions about legal issues, can be considered sufficiently coercive to render a

subsequent statement to be involuntary. *Lall*, 607 F.3d at 1285-1286. The issue,

ultimately, is whether any false promise or legal assurance seriously impeded the

Defendant's ability to make a rational choice, by distorting his ability to "'weigh

the pros and cons of confessing,'" *Lall*, 607 F.3d at 1286 (*quoting United States v.

Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)).

Various factors in this case are consistent with voluntariness. Defendant

was not subjected to any physical coercion, physical threats, or any acts of

intimidation beyond what appeared to be reasonably necessary to gain entrance and

secure the residence for purposes of a search (and which had dissipated by the time

of the interview).  The Defendant was advised that he was free to leave and free to refuse to answer questions, including specifically about his password.  Thus, the interview was not undertaken or agreed to under coercion and much of the discussion appears to be free from traditional concerns of coercion.

Defendant focuses on what he characterizes as psychological coercion apparently aimed at getting Defendant to share his password.  It is in this narrow area that the Court shares some concern with the Defendant.  Indeed, the record includes statements that could have been reasonably interpreted by Defendant as promises that disclosure of his password would not result in a search, and other false statements of law specifically tied to disclosure of the password.

Specifically, as part of his efforts to persuade the Defendant to share his password, Inspector Bell stated, **"we're not going into your e-mails or anything like that."**  Ex. 1 at approx. 19:00-20:00.  The inspectors did not otherwise clearly disclose in any discussion cited to the Court that they intended to search the contents of the phone, including for e-mails and other documents, at least until a flawed request for consent at the very end of the interview.  Rather, the inspectors made an unexplained reference to simply needing to make an "image" or "copy" of the phone.  *Id*.  The combination of these statements could reasonably suggest to a non-computer expert in Defendant's position, that whatever the inspectors were

needing his password for did not include "going into your emails" or other data "like that."[4]

Of course, the inspectors at that time had in hand a warrant that authorized them to search for a wide range of records and documents, "in any format or medium," including "correspondence," "calendars," "digital contact lists," "photographs" and "videos." *See* Ex. 1. It appears undisputed that the inspectors did, in fact, extensively search Defendant's phone, including presumably for "correspondence," and the Government asserts that the inspectors were authorized by the warrant to do so.

Therefore, Defendant was given what could be seen as a false assurance: that if he shared his password, the agents would "not go[] into your e-mails or anything like that." In fact, it appears that the agents used his password as the first step in doing exactly what they assured they would not do, i.e., look for e-mails and many other things "like that," throughout the electronic memory of his phone. Nor was this false assurance isolated or peripheral. This promise could have reasonably

---

[4] Inspector Bell did not testify as to his subjective intent in making this promise. But the question of coercion is evaluated from the perspective of a reasonable person in the suspect's position. *See, e.g., United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). More precisely, because the Government bears the burden of proof and persuasion, the question is whether the Government has shown that a reasonable person in Defendant's position would not have interpreted the statements as a legal promise or assurance.

been interpreted as going directly to the fundamental issue presented in this motion: whether the agents would conduct electronic searches of Defendant's data if he divulged his password.

Again, notably, the Government does not address this point or Inspector Bell's assurance at all, despite it being a specific argument advanced by the Defendant as to involuntariness. *See* Def. Br. [54] at 20-21.

Although this false assurance was the major problem, it was not the only potentially misleading statement of law. The inspectors continually stated to the Defendant that sharing the password would speed up the return of the phone. But as of the evidentiary hearing approximately eight months later, the Defendant had still not received the phone back, as is not surprising given that it was seized as suspected evidence in a criminal investigation. The Government provides no explanation for why the inspectors in these circumstances were even remotely accurate in advising the Defendant, as a legal matter, that the length of their ongoing seizure and custody of this evidence would be a function of Defendant's willingness to share his password. The Government's only response, rather, is to conclusorily assert that this apparently false statement was "irrelevant to whether the Defendant's will was overborne." Gov't Br. [59] at 20.

These statements are not "irrelevant."  Promising a quick return of a phone may have falsely inflated the perceived "pros," or advantages, of sharing the password.  Indeed, obtaining his phone back was evidently material to the Defendant, as he was clearly concerned about losing his phone.  *See* approx. Ex. 1 at 20:00 ("so I'm not going to have a phone?")  The Court agrees, however, that promises to return a phone, alone, would not likely distort a suspect's ability to "'weigh the pros and cons of confessing,'" *Lall*, 607 F.3d at 1286 (*quoting United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)).  Such a promise would not have impacted any assessment of the "cons" of confessing.  However inconvenient the loss of a smart phone may be in modern life, avoiding that loss is not likely to induce someone to reveal seriously incriminating information.

Nevertheless, these statements must be considered in context, and in combination with the inspectors' other promises and claims.  At the same time as they falsely inflated the perceived "pros" of disclosing the password—by falsely promising return of the phone—the inspectors also appeared to seriously falsely minimize the "cons"—by assuring Defendant that they would not "go[] into your emails or anything like that."  As a result, a reasonable suspect could have understood the agents to suggest that if he divulged his password, he would not suffer, because they would not use that password to facilitate searches in email or similar data, and he would likely benefit by getting his phone back faster.  The

result was a distorted choice by which Defendant appears to have been denied the ability to make a fully informed pro/con decision.

Ultimately, the Defendant gave the password for the immediate reason that he needed to get his lawyer's phone number. But the totality of the evidence suggests that the Defendant believed that he was sharing the password for this limited purpose. Indeed, the inspectors had not revoked the assurance made several minutes earlier, that "we're not going into your e-mails or anything like that." Thus, Defendant could have reasonably believed at that time—because of Inspector Bell's assurance—that the sharing of his password was not going to result in an investigative search of electronic records. And the Defendant still made the decision to share his password under the apparently false impression that he would then receive the phone back shortly.[5]

---

[5] The Defendant further argues that it was also coercive, and/or an improper ploy, for the agents to force the Defendant to state his password to obtain access to his lawyer's number, as opposed to allowing Defendant to retrieve it himself from the phone. The Court disagrees with this proposition. The agents were not required to relinquish custody of a seized item of evidence back to the suspect, nor would doing so be remotely expected in the context of the execution of a search. The phone, after all, was an item seized under the warrant, and contained many other electronic files subject to search as well. It was thus appropriate police practice for the inspectors to retain custody of the phone and not just hand it back to the suspect, who could use that opportunity to spoliate data or otherwise undermine the integrity of any evidence on that phone.

The rest of the interview corroborates that Defendant did not understand, at least as of when he shared the password, that it would be used to facilitate a search. Indeed, it was only after he shared the password that the inspectors requested Defendant's consent to search the phone.  Notably, Defendant hesitated, and indicated that he needed to talk to his lawyer about this brand-new request.  This exchange suggests that the Defendant did not at that juncture believe that any search would be undertaken simply because he shared the password, or that he understood that the agents would be using his password to facilitate such a search. This very well may have been because he had been expressly advised, "we're not going into your e-mails or anything like that."[6]

In the end, it is the Government's burden to show that the Defendant voluntarily shared his password, meaning that it was not induced by a deception of

---

[6] The Defendant subsequently consented to the search after his initial reluctance to do so, but the Government does not justify the search on grounds of consent or otherwise contend that this consent was voluntary.  The facts regarding this consent are problematic.  After the Defendant indicated that he needed to consult with his lawyer about whether to consent, Inspector Bell appeared to advise him, "[t]he phone part of it, *you don't need an attorney*." *Id*. at 41:41.  After receiving that apparent legal advice, the Defendant acquiesced.  An argument could be raised that this statement was false and/or improper legal advice, and vitiated any voluntariness of the consent.  That question is not specifically before the Court. But it bears noting that the Government does not argue, and the facts do not suggest, that the Defendant's later "consent" does not itself support a finding that he voluntarily shared his password.

law or false assurance, and that Defendant was able to make a rational choice with full appreciation of the "pros" and "cons" of disclosure. The Government has not met its burden for the reasons stated above. Thus, the Court **RECOMMENDS** that the Motion to Suppress Statements be **GRANTED IN PART**, and that the Defendant's statements about his telephone password be **SUPPRESSED**. The Court recommends that the Motion be **DENIED IN PART** as to the remainder of the interview, as there was otherwise no coercion employed except as to the narrow subject of the password.

## II.     MOTION TO SUPPRESS ELECTRONIC EVIDENCE

### A. *Suppression As A Fruit Of The Fifth Amendment Violation*

"[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (emphasis in original); *United States v. Patane*, 542 U.S. 530, 640 (2004) (plurality opinion).[7]  The Government does not deny that it gained access to the contents of the phone by using the password supplied by the Defendant during the interview. The Government also does not argue that the search warrant authorized it to breach Defendant's *Fifth Amendment* right against self-

---

[7] By contrast, the physical fruits of a voluntary confession are not subject to suppression based on a violation of *Miranda* alone. *Patane*, 542 U.S. at 630.

incrimination in gaining access to the phone. *Cf. In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1349-1350 (11th Cir. 2012) (recipient of a subpoena for computer files could not be compelled to produce a password to decrypt those files without immunity extending not just to the act of production, but also to the use of any derivative evidence, that is, the decrypted files themselves).

Therefore, the search results were in fact derived from Defendant's involuntary statements. It follows that physical proceeds of the Fifth Amendment violation (the results of the search of the phone) must also be suppressed.[8]

### B. *Inevitable Discovery*

The Government urges that even if the inspectors committed violations in inducing Defendant to divulge his password, the Court should nonetheless deny suppression of the results of the electronic searches of the phone on grounds of inevitable discovery. Specifically, Inspector Petronis testified that at some point he consulted with an unnamed "forensic computer analyst" employed by the Postal

---

[8] The phone itself, of course, is not subject to suppression. It is undisputed that the agents seized the phone pursuant to the authority granted in the warrants, without any violation of Defendant's Fifth Amendment rights. The Court's recommended ruling, moreover, is limited to the searches conducted in the electronic contents of the phone as a result of using the password to access it. The Court expresses no opinion as to any other searches, if authorized, that do not rely on the use of the password to access the phone.

Inspection Service, who expressed the belief that he (the analyst) would have been able to access the phone without the password.  Tr. at 46.  The only explanation or detail that was offered to explain this procedure—about which the witness, Inspector Petronis, had no personal knowledge—was the following:

Q.  All right.  And it's using something called Cellebrite; is that right?

A.  Yes.

*Id.*

Under the doctrine of inevitable discovery, the exclusionary rule does not apply to illegally-obtained evidence, if that evidence "inevitably or ultimately would have been discovered by lawful means without reference to the police misconduct."  *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990).  However, the "[G]overnment bears burden of showing, by reference to 'demonstrated historical facts' and by a preponderance of the evidence, that the information or item would inevitably have been discovered by lawful means." *United States v. Infante–Ruiz*, 13 F.3d 498, 503 (1st Cir. 1994).  The Government must also show that law enforcement possessed and was actively pursuing the lawful avenue of discovery when the illegality occurred.  *See United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007).

The Government has simply not met this burden of proof.  The issue of inevitable discovery was treated as somewhat of an aside at the hearing, with a total of two substantive questions and answers.  The gist of this minimal testimony was that Inspector Petronis introduced the conclusory and entirely unexplained opinions of an unnamed computer analyst, for the bald assertion that "we would be able to get into the phone without the password."  The only fact introduced in this exchange was that this process would use "something called Cellebrite."  Inspector Petronis had no apparent knowledge about anything that he was being asked about, and was simply repeating what this unknown analyst with unknown qualifications stated at some unknown time.

The Court is mindful that the rules of evidence do not strictly apply at pretrial suppression hearings, and that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges."  Fed.R.Evid. 104(a).  Nevertheless, the Court has the discretion to decline to give weight to evidence that lacks sufficient substance or foundation.  Here, the Court was essentially provided with the bare hearsay conclusion of an unknown witness without any explanation about a complicated technical matter.  The Court simply cannot attach much weight to this statement.  Because this is a

matter as to which the Government bears the burden of proof, the Court cannot rest a denial of suppression on the inevitability doctrine on this record.

Moreover, even if some analyst now retrospectively opines that there would have been other ways to access the phone, that assertion itself (even if credited) does not establish every element of the inevitability doctrine. The Government offered no testimony to show that these means (whether "Cellebrite" or otherwise) were available during the period authorized by the search, that this unnamed forensic analyst or another one with similar knowledge would have been involved in the execution of the search, or more generally that any of these tools or methods were part of the search protocol and procedures at the time or otherwise likely would have been utilized during this search. Without more facts and support, the Government's inevitability argument simply falls short.

Thus, the Court **RECOMMENDS** that the Defendant's Motion to Suppress Electronic Evidence be **GRANTED**.[9]

---

[9] Defendant alternatively argues that, even if the inspectors had lawfully unlocked and gained access to the contents of the phone's electronic storage, the subsequent search of the phone was not authorized by the warrant. Specifically, the warrant identified the premises to be searched as the building itself, and did not expressly permit additional searches of electronic devices found within the house. Defendant thus argues that the warrant merely authorized the search *for* electronic devices within the house, and that additional warrants would have been necessary to authorize searching *within* the electronic contents of those devices. This issue is

# CONCLUSION

Thus, the Court **RECOMMENDS** that Defendant's Amended Motion to

Suppress Statements [24] be **GRANTED IN PART AND DENIED IN PART** as

---

moot considering the Court's other recommendations.  But for the sake of completeness, the Court finds this alternative argument to be meritless.

The Court addressed this issue in depth in similar circumstances in *U.S. v. Thomas Hendley*, 1:14-CR-453, 2015 U.S. Dist. LEXIS 162152 (N.D. Ga. Oct. 19, 2015) (Anand, M.J.), *adopted by* 2015 U.S. Dist. LEXIS 161726 (N.D. Ga. Dec. 1, 2015) (Evans, J.).  In *Hendley*, after extensive consideration, the Court concluded that the well-established rule of *United States v. Ross*, 456 U.S. 798, 821 (1982) controlled.  In that case, the Supreme Court made clear that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  *Id*. at 821.  Here, as in *Hendley*, this principle justifies the search of the contents of the phone—an object or container found within the house being searched—for files and records authorized by the warrant.  Indeed, as in *Hendley*, the items to be searched as listed in Attachment B to the warrant expressly included digital and computer files, as well as the contents of computer media, and other files "in any format or medium." Thus, the issuing Magistrate Judge clearly anticipated and authorized a search not just *for* electronic devices inside the premises but also a search *within* the electronic contents of those devices for other  items referenced in Attachment B. At a minimum, the agents would have been within their rights to rely on the authority in the warrant in good faith in searching the contents of the phone, had they initially lawfully accessed it.

Also, although the Government in an apparent excess of caution discusses the sufficiency of the showing of probable cause in the warrant application, Defendant does not appear to assert any challenge to such sufficiency in its Amended Perfected Motion [41] or its Post-Hearing Brief [54].  Thus, the Court considers any such argument to be unasserted or abandoned.  In any event, the Court has reviewed the warrants and warrant applications and concludes that they are based on adequate probable cause.

discussed above, and that Defendant's Amended Motion to Suppress Electronic Evidence [41] be **GRANTED**.

As to all other motions currently still appearing on the docket as active, the Clerk is **DIRECTED** to terminate Defendant's Motion to Suppress Identification Testimony [19], as to which the Defendant confirmed at the evidentiary hearing he is abandoning.  Tr. at 6.[10]  The variety of other motions referred to as suppression motions on the docket [18][21][23] should also be terminated, as those are preliminary and unperfected initial versions of the same motions that Defendant later amended and perfected in the form of (and have been superseded by) the motions discussed above [24] and [41].

This matter is now **READY FOR TRIAL**.

**IT IS SO RECOMMENDED and ORDERED** this 12th day of June, 2018.


_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

[10] The Motion for Extension of Time relating to the identification motion [25] is likewise **DENIED** as moot.